HARRIS ST. LAURENT & WECHSLER LLP
Jonathan Harris (State Bar No. 168037)
  *(pro hac vice forthcoming)*
  jon@hs-law.com
Robert Cohen (*pro hac vice forthcoming*)
  rcohen@hs-law.com
40 Wall Street, 53rd Floor
New York, NY 10005
Telephone: (212) 397-3370
Facsimile: (212) 202-6206

ELLIS GEORGE LLP
Eric M. George (State Bar No. 166403)
  egeorge@ellisgeorge.com
Todd M. Lander (State Bar No. 173031)
  tlander@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff Harley Bassman

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| HARLEY BASSMAN<br><br>Plaintiff,<br><br>vs.<br><br>SIMPLIFY ASSET MANAGEMENT, INC., and DOES 1 THROUGH 10,<br><br>Defendants. | Case No. 8:26-cv-00846<br><br>**COMPLAINT FOR DAMAGES:**<br><br>**1. Breach of PFIX Agreement**<br>**2. Breach of Revenue Share Agreement – MTBA**<br>**3. Breach of Revenue Share Agreement – RFIX**<br>**4. Quantum Meruit – MTBA**<br>**5. Quantum Meruit – RFIX**<br>**6. Failure to Pay Earned Wages – Labor Code §§218.5, 218.6**<br>**7. Retaliation for Asserting Wage Rights – Labor Code § 98.6**<br>**8. Unfair Business Practices – B&P Code § 17200, et seq.**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Trial Date: None Set |

3131939

-1-

## PRELIMINARY STATEMENT

1.　　　Simplify lied to Harley Bassman. Then it lied to its investors. The company agreed to pay Bassman for the Exchange-Traded Funds ("ETFs") he designed. It then broke that agreement. The benefit of the parties' bargain was straightforward. Simplify recruited Bassman for what he could build and what his name would bring: ideas for new ETFs, credibility in the market, and access to investors. In return, Simplify agreed to compensate him with a defined share of the revenue those ETFs would generate. Bassman performed. Simplify profited. But Simplify did not pay.

2.　　　Bassman, known throughout the investment industry as "The Convexity Maven," is one of the most recognized names in fixed-income markets. He invented the MOVE Index, which is the industry-wide standard for measuring interest-rate volatility— the bond market's equivalent of the CBOE Volatility Index (VIX). Bassman spent more than 26 years at Merrill Lynch, where he ran the firm's Global Options and North American Mortgage businesses. He later held senior roles at Credit Suisse and PIMCO. Those credentials made Bassman valuable not only for the ETFs he could design, but also for the credibility his name lent to them.

3.　　　When Simplify recruited Bassman, it was a young startup with a handful of employees. Bassman joined the firm as the Managing Partner, and he was the only employee to invest his own capital in the business, acquiring approximately 5% of its shares. His stature in the market, product ideas, and investor relationships helped Simplify grow from an early-stage startup into an asset manager overseeing more than $10 billion in investor assets.

4.　　　Bassman did what Simplify asked him to do. He designed the ETFs at issue and Simplify made money from his work. But when Bassman demanded the compensation Simplify had promised, the company refused to pay what it owed. Simplify then compounded the damage by retaliating against Bassman. It filed prospectus supplements for the funds Bassman created (and two additional funds)

3131939

-2-
COMPLAINT

with the United States Securities and Exchange Commission, stating that "effective immediately" Bassman no longer was a portfolio manager for those ETFs. Simplify also cut him off from internal communications and deliberations concerning internal trading, risk, and sales matters.

5.      The current dispute over his compensation was not the first time Bassman confronted Simplify management and was ignored. In January 2025, Bassman and twelve other senior executives offered detailed recommendations to Simplify's CEO to move the company toward a structured institutional asset management framework—one that would include the adoption of industry best practices, such as the establishment of an Investment Committee. The recommendations were prompted by changes in the portfolio management strategy of SVOL, Simplify's most profitable fund. But Simplify did nothing in response to those recommendations – it still has no Investment Committee and, in fact, to Bassman's knowledge, it has not adopted any of the senior executives' recommendations.

6.      Having lied to Bassman about his compensation, Simplify then proceeded to lie to investors.

7.      Even as Simplify sidelined Bassman internally, it continued to recognize the commercial value of his association with the firm. When an investor asked about the removal of Bassman's name from the prospectuses, Simplify lied and reassured the investor that it was "business as usual." Simplify's website still has a picture of Bassman with his name and the title "Managing Partner" on its "Leadership" page despite the fact that Bassman is banned from company Slack channels where key aspects of the firm's operations and strategies are discussed.[1] Simplify wants the benefit of Bassman's market stature without paying the compensation its contracts require.

---

[1] *See* https://www.simplify.us/leadership

3131939

-3-

8.      This action seeks to hold Simplify to the commitments it made and the obligations it undertook. Having taken the benefits of Bassman's work, ideas, and market stature, Simplify must now honor its bargain.[2]

## THE PARTIES

9.      Plaintiff Harley Bassman is an individual residing in Laguna Beach, California.

10.      Defendant Simplify Asset Management, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Las Vegas, Nevada. Simplify is a registered investment advisor that creates, sponsors, and manages exchange-traded funds. Upon information and belief, Simplify manages in excess of $10 billion in investor assets across numerous ETFs.

11.      On information and belief, Defendants DOE 1 through 10 are the agents, employees, and/or representatives of the other named Defendants and, at all relevant times, acted within the scope of their agency or employment when they engaged in the conduct described in this complaint. At all relevant times, DOES 1 through 10 were acting within the course and scope of their employment, and were acting under color of state law. The identities and particular capacities of DOES 1 through 10 are presently unknown to Bassman. Bassman therefore sues these defendants by fictitious names. Bassman is informed and believes and therefore alleges that DOES 1 through 10 were responsible in some manner for the occurrences herein alleged, and that Bassman's injuries as herein alleged were proximately caused by said defendants. Bassman will amend the Complaint to substitute the true names and capacities of DOES 1 through 10 when ascertained.

---

[2] Simplify appears to have a habit of dishonoring employment contracts. Less than two weeks ago, a former Simplify employee filed a multimillion-dollar employment action against the company in federal court. See *Forjoe v. Simplify Asset Mgmt., Inc.,* No. 1:26-cv-01666 (N.D. Ga. filed Mar. 27, 2026).

3131939

-4-

COMPLAINT

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Bassman's claims occurred in this District, including the negotiation and formation of the agreements through communications directed to Bassman in this District, Bassman's substantial performance of the agreements in this District, and Simplify's obligation to account for and pay Bassman for that performance in this District.

## FACTUAL ALLEGATIONS

**Simplify recruits Bassman to build credibility and grow the firm's unique ETF offerings.**

14.     Simplify was founded in 2020 by Paul Kim and David Berns as a registered investment advisor focused on creating and managing exchange-traded funds. In January 2021, while still in its infancy, Simplify recruited Bassman. At the time, Simplify was a startup with a handful of employees, limited assets under management ("AUM"), and no significant industry track record.

15.     Simplify sought Bassman for several reasons. Bassman's reputation would lend instant credibility to a startup ETF sponsor seeking to attract institutional and high-net-worth investors. His relationships with senior management at major Wall Street firms—developed over more than three decades on Wall Street—would provide Simplify with access to institutions and individuals that would otherwise be unavailable to a newly-established firm of its size.

16.     When Simplify brought Bassman on as the Managing Partner in early 2021, it touted his credentials, boasting that "[t]here is no better source for insight and education around options and volatility than Harley's writing." Simplify had a

3131939

goal to be "the authority on options." And by hiring Bassman, the firm said, it was "accomplishing just that."

17.     To this end, Bassman was designing innovative ETFs. The first product would package over the counter ("OTC") interest rate options—typically available only to institutional investors—into a retail-accessible product. This was something Simplify could not do on its own.

18.     What is more, through his reputation and connections, Bassman secured for Simplify critical contracts that a young firm could never have hoped to obtain on its own: International Swaps and Derivatives Association ("ISDA") master agreements with major dealer banks. Without these agreements, Simplify could not have operated—and could not be presently operating—a sizable portion of its fund lineup.

19.     An ISDA master agreement is the standard contract that governs OTC derivatives trading between two financial counterparties. Many of Simplify's ETFs use options, swaps, and other derivatives as part of their investment strategies. To execute these trades, Simplify needed separate ISDA master agreements with each dealer bank it traded with, including Morgan Stanley, Goldman Sachs, Bank of America, and JP Morgan.

20.     Major dealer banks do not ordinarily enter into ISDA master agreements with small, unknown firms because of counterparty credit risk—that is, the risk that the firm cannot meet its obligations. But Bassman contacted senior management at these banks, drawing on his professional reputation and decades-long relationships to secure their willingness to enter into ISDA master agreements with Simplify. For a startup asset manager like Simplify, obtaining ISDA master agreements with top-tier dealer banks cleared a critical barrier to entry. Bassman's ability to clear that barrier gave Simplify a competitive advantage that few firms of its size could have achieved.

**Simplify and Bassman enter into a contract for the first ETF Bassman designed—PFIX.**

21.     The first new ETF Bassman developed for Simplify was PFIX (the Simplify Interest Rate Hedge ETF). It is an actively managed ETF designed to hedge against rising long-term interest rates and increasing rate volatility. PFIX uses OTC interest rate options to achieve a direct and transparent convex exposure to large upward moves in interest rates and interest rate volatility.

22.     On January 21, 2021, Paul Kim, Simplify's CEO and co-founder, sent Bassman an email setting forth proposed compensation terms: "60% net revenue of the new ETF & a 25% perpetual trailer on that ETF."

23.     Four days later, Bassman and Kim executed a written agreement encompassing the terms Kim proposed (the "PFIX Agreement"). It is a single-page typed sheet, signed by both Bassman and Kim and dated January 25, 2021. (**Exhibit A** is a copy of the PFIX Agreement).

24.     Bassman's compensation for developing PFIX has two components, each of which is based on a revenue share. While he is employed at Simplify, the company will pay him "60% of net revenue of new ETF." If Bassman leaves the company, Simplify will continue to pay him "25% of net revenue of new ETF." Simplify agreed to make these payments "in perpetuity as long as EFT remains listed:"

> Simplify to launch ETF asap in 2021 (potentially file in February; launch late April/early May)
> **60% of net revenue of new ETF** while at Simplify (net of costs of ETF, estimated roughly $100k a year +3-5 bps custody)
> **25% of net revenue of new ETF** in perpetuity as long as ETF remains listed

(Ex. A).

25.     The PFIX Agreement defines "net revenue" as the "net of costs of ETF." That definition then makes clear that the "costs" used to determine the "net revenue" relate solely to the costs of operating the ETF itself. (*Id.*).

26.     The PFIX Agreement also provides a formula for calculating the estimated yearly "costs" of operating PFIX to determine the "net revenue." The

formula has a fixed and variable component: "$100k a year + 3-5 bps custody."(*Id*). That is to say, the yearly costs of the ETF are $100,000 plus three to five basis points[3] of PFIX's AUM. (*Id*.). By way of example, if the fund had $500 million in assets, then using the top number of five basis points, the "costs" of operating PFIX would be approximately $350,000.[4]

27.　　The PFIX Agreement includes a table projecting Bassman's compensation for developing PFIX as four levels of AUM, using a 50-basis-point revenue figure:

**HB new ETF revenue estimates at 50 bps:**

|  | Gross revenue | Less costs | Net rev | HB Share | Annuity |
|---|---|---|---|---|---|
| 100M | $ 500,000 | $ (150,000.0) | $ 350,000 | $ 210,000 | $ 87,500 |
| 250M | $ 1,250,000 | $ (225,000.0) | $1,025,000 | $ 615,000 | $ 256,250 |
| 500M | $ 2,500,000 | $ (350,000.0) | $2,150,000 | $ 1,290,000 | $ 537,500 |
| 1B | $ 5,000,000 | $ (600,000.0) | $4,400,000 | $ 2,640,000 | $ 1,100,000 |

(*Id*).

28.　　The table in the PFIX Agreement unmistakably shows that, in calculating Bassman's compensation—both while he is employed at Simplify and post-employment—the company agreed that the "costs" used to arrive at the "net revenue" figure were to be determined by the "$100k a year + 3-5 bps custody" formula. For instance, the costs associated with $1 billion in AUM is $600,000. This is equal to $100,000 + (0.0005 x $1,000,000,000).

**Simplify initially honors the PFIX Agreement.**

29.　　Bassman performed all work required of him under the PFIX Agreement to develop the fund. PFIX launched on May 11, 2021, and quickly attracted substantial investment, reaching a peak of nearly $470 million in AUM in

---

[3] 1 basis point equals 0.0001.

[4] $350,000 = $100,000 + ($500,000,000 x 0.0005).

October 2022. That represented a significant portion of Simplify's total assets under management.

30.    For the first two years under the PFIX Agreement, Simplify complied with the Agreement and paid Bassman a share of PFIX revenue using the Agreement's definition of "cost." For 2021, Simplify paid Bassman $125,000 as his PFIX revenue share—an amount that, if anything, exceeded what a strict application of the PFIX Agreement's formula would have yielded.

31.    For the year 2022, Simplify paid Bassman $700,000 for his PFIX revenue share. This payment falls squarely within the $685,00 to $717,000 range calculated using the PFIX Agreement's definition of "costs"—"$100k a year + 3-5 bps custody." (Ex. A).

**Simplify reverses course and breaches the PFIX Agreement.**

32.    Less than three years into its agreement with Bassman, Simplify broke its promise and breached its contractual obligations. Simplify did not make any payments to Bassman in 2023 and 2024. In 2025, it paid Bassman a total of $150,000—a fraction of what it owed.[5] And the company has not provided any indication that it intends to pay Bassman going forward despite repeated efforts by Bassman to obtain Simplify's commitment to honor its contractual obligations and agree on a go-forward payment schedule.

33.    PFIX is, and always has been, profitable. So, Simplify is either reneging wholesale on the PFIX Agreement or improperly calculating the "costs" to PFIX to render it "unprofitable" for the purposes of determining Bassman's compensation under that Agreement. Either way, Simplify has breached the contract.

---

[5] Bassman's understanding is that the payments were for PFIX, MTBA, and RFIX combined, though he is unaware of how the payments were allocated among the funds. *See infra* paragraphs 35-45.

3131939

COMPLAINT

34. As explained above, the costs to be deducted from PFIX revenues are formulaic. Under the PFIX Agreement they are $100,000 + 3-5 basis points of the fund's average AUM for the year. For two years Simplify paid Bassman using the PFIX Agreement's cost formula. Simplify has no right to calculate costs in any other way.

**Simplify and Bassman enter into a revenue-share agreement for two additional ETFs—MTBA and RFIX—which Simplify then promptly breaches.**

35. Bassman developed two more ETFs for Simplify. MTBA (Simplify MBS ETF) is an actively-managed ETF that invests in newer mortgage-backed securities ("MBS") with higher interest rates/coupons and higher yield to maturity than the holdings of the large, Index MBS-focused ETFs. MTBA is one of Simplify's largest funds.

36. Bassman also created RFIX (Simplify Bond Bull ETF). It is an actively-managed ETF designed to hedge against falling long-term interest rates and benefit from periods of fixed-income market stress. It does so primarily through long-dated OTC interest-rate derivatives, alongside holdings such as U.S. Treasurys and other fixed-income instruments.

37. By August 2024, MTBA was already operating and Bassman was developing RFIX. On August 5, 2024, in a direct Slack message exchange with Bassman, Kim offered Bassman "a 20% revshare on MTBA" and "20% of RFIX and anything else we spin up together in the meantime." On August 8, 2024, Kim confirmed that Bassman's "potential value added going forward is the best framework" and added, "Let's be good w/ the additional revshare on the great ETFs like MTBA for now."

38. The parties then discussed the mechanics of the MTBA revenue share. On August 9, 2024, after Bassman asked about the "schedule," Kim responded that it was based on "monthly revenue (average AUM for the month)," confirming that

Simplify would calculate the MTBA revenue share prospectively based on the fund's monthly revenue.

39.     Bassman accepted Kim's offer of the 20% revenue share for MTBA and RFIX through his continued performance—including his ongoing management of MTBA and his continued development of RFIX after August 5, 2024—and through his subsequent conduct treating the arrangement as binding. On August 13, 2024, Bassman asked Kim to have John Ryu, Simplify's CFO, "confirm the 'rev share' for 2023," and stated he was "happy to keep it as a firm liability." Bassman's continued work on RFIX and MTBA, and his offer to defer payment and keep the amount owing as a firm liability to be paid in the future, constitute both acceptance of Kim's offer and the consideration exchanged for Simplify's promise to pay.

40.     Kim made the statements above on Simplify's behalf and within the course and scope of his authority as the CEO of the company, and he had actual and, at least, ostensible authority to bind Simplify to the revenue-share arrangement he offered Bassman.

41.     Kim did not use the word "net." He did not reference costs or deductions. He did not incorporate the PFIX Agreement's expense methodology by reference or otherwise. He did not describe a tail payment if Bassman later left the company. Instead, he stated "20% revshare"—and nothing more.

42.     That contrast with the PFIX Agreement is meaningful. In the ETF industry, and in Simplify's own subadvisory arrangements with third parties who designed products for the firm, payment based on a stated percentage of revenue without any deduction-based qualifier refers to a share of gross revenues, not net revenues.

43.     When Simplify intended a net-revenue arrangement, it said so expressly and defined the term. In the PFIX Agreement, for example, Simplify did not merely refer to "revenue share" or "revshare." Instead, it used the term "net revenue" and then specifically detailed how Simplify would calculate that figure for

3131939

-11-

COMPLAINT

the PFIX fund. The PFIX Agreement also included examples of the calculation in a table. Kim used no such language here.

44.     Accordingly, the revenue-share arrangement formed through the parties' August 2024 written communications entitles Bassman to 20% of MTBA and RFIX gross—and not net— revenues. On information and belief, Simplify's standard practice is to use gross revenue when determining compensation based on a revenue share.

45.     Again, Simplify has not honored its obligations. To date, it has refused to pay Bassman what he is owed for creating MTBA and RFIX.[6]

**Simplify cannot reduce Bassman's MTBA compensation by its unilateral fee waivers or by excluding fees generated from MTBA assets parked in the SBIL ETF.**

*MTBA fee waiver.*

46.     Simplify should not be permitted to reduce Bassman's compensation because it unilaterally decided to waive approximately 40% of MTBA's management fees through at least October 31, 2026. This waiver has reduced the fund's collected revenue from approximately $6.86 million (at its stated rate) to approximately $4.68 million.

47.     A fee waiver is not a cost of operating a fund. It is a voluntary decision by the fund's sponsor to collect less revenue than the stated management fee. The fee waiver is Simplify's business decision. Bassman should not bear its cost. If Simplify could unilaterally reduce the revenue base on which Bassman's share is calculated, Bassman's compensation would be entirely subject to Simplify's unfettered discretion, making the agreement illusory.

---

[6] *See supra* paragraph 32 and accompanying footnote.

***MTBA assets in the SBIL ETF.***

48.     In July 2025, Simplify launched SBIL (Simplify Government Money Market ETF). SBIL is a government money market fund that invests at least 99.5% of its assets in cash, U.S. government securities, and fully collateralized repurchase agreements. Simplify has described SBIL as its "cash management vehicle for its ecosystem of mutual funds and ETFs."

49.     Simplify charges an expense ratio of 0.15% (15 basis points) on SBIL. The fund has approximately $4.7 billion in AUM, generating more than $7 million per year in management fees for Simplify, representing over 15% of the firm's total revenues.

50.     Simplify parks a substantial portion of MTBA's cash holdings in SBIL. This is a decision Simplify management made. It was not a component of the MTBA fund as designed by Bassman, and Bassman played no role in the decision to route MTBA cash into SBIL.

51.     By storing MTBA cash in SBIL—instead of keeping it within MTBA— Simplify collects two sets of management fees from MTBA investors: one from MTBA and one from SBIL. The MTBA fees are based on the entirety of the fund's assets, including its cash that is sitting in SBIL. Simplify charges an additional fee to MTBA investors based on the MTBA cash SBIL is holding.

52.     The revenue Simplify earns from SBIL is directly attributable to MTBA's assets under management. Under the revenue share agreement, Bassman is entitled to 20% of revenues attributable to MTBA, including the SBIL revenues generated by MTBA's cash holdings.

**Simplify rejects Bassman's attempts to resolve the compensation dispute, retaliates against Bassman, and then lies to investors about its actions.**

53.     Over the course of many months, Bassman attempted to engage Simplify in discussions to address the failure to pay him the revenue share

3131939

-13-

COMPLAINT

compensation he is owed. Simplify rebuffed his efforts. It stonewalled. Then it retaliated.

54.    On November 14, 2025—four days after receiving a letter from Bassman's counsel seeking to resolve the matter—Simplify filed prospectus supplements with the U.S. Securities and Exchange Commission stating that, "effective immediately," Bassman was no longer the Portfolio Manager for PFIX, MTBA, RFIX, and two additional funds. As the Portfolio Manager for the funds, Bassman was responsible for monitoring market conditions and adjusting the funds' portfolios to ensure they operated consistently with their stated investment objectives, including evaluating underlying instruments, executing trades, and managing risk exposures. Without warning, Simplify stripped Bassman of these responsibilities without any regard to the consequences for investors in these funds. Two months later, Simplify banned him from internal trading, risk, and sales Slack channels.

55.    But when an investor noticed that Bassman was no longer the listed PM and inquired as to Bassman's status, Simplify lied. It told the investor that Bassman's role had not changed and that it was "business as usual."

56.    For months—and most recently in February of this year—Bassman has tried to resolve this dispute amicably. Simplify has delayed. Simplify has equivocated. Simplify has gone silent. Simplify's actions have left Bassman no choice but to file this action.

## FIRST CAUSE OF ACTION

### Breach of PFIX Agreement

57.    Bassman repeats and realleges the allegations in paragraphs 1 through 56 as if fully set forth herein.

58.    The PFIX Agreement is a valid and enforceable contract between Bassman and Simplify.

59.    Bassman performed all his obligations under the PFIX Agreement.

3131939

-14-

COMPLAINT

60.     Simplify has breached the PFIX Agreement by refusing to pay Bassman the full amounts owing to him for 2023, 2024, and 2025.

61.     For each of these years, Bassman is entitled to 60% of the fund's "net revenue," which is determined under the PFIX Agreement as follows:

- Gross revenue equals 50 bps of the fund's average AUM for the year in question.
- Net revenue equals gross revenue, "net of costs of" PFIX.
- "Cost of" PFIX is "estimated roughly $100k/yr + 3-5bp custody." In other words, the costs are determined by adding $100,000 to the product of the fund's average AUM for the year multiplied by 5 basis points. (For purposes of this claim, Bassman uses 5 basis points, the highest end of that range and therefore the most conservative measure because it yields the lowest amount owed.)

62.     As a direct and proximate result of Simplify's breach, Bassman has been damaged in an amount to be determined at trial, but not less than approximately $1,170,000, exclusive of pre-judgment interest.

## SECOND CAUSE OF ACTION

### Breach of Revenue Share Agreement—MTBA

63.     Bassman repeats and realleges the allegations in paragraphs 1 through 62 as if fully set forth herein.

64.     The revenue-share agreement between Bassman and Simplify for MTBA, formed through written communications in August 2024, is a valid and enforceable contract. Kim, acting within the scope of his actual and ostensible authority as Simplify's CEO, offered Bassman a 20% revenue share on MTBA. Bassman accepted by continuing to supervise and manage the fund, by continuing to market the fund through news outlets and other media, and by treating the agreement as binding. Bassman's continued work on MTBA constituted sufficient consideration for Simplify's promise to pay.

65.     Bassman performed all his obligations under the revenue share agreement.

66.     Simplify has breached the revenue share agreement by refusing to pay Bassman anything for his work on MTBA.

67.     Bassman is entitled to 20% of MTBA's gross revenues, calculated at MTBA's stated management fee rate, without reduction for Simplify's unilateral fee waivers. In addition, Bassman is entitled to 20% of the revenues attributable to MTBA assets held in SBIL, calculated at SBIL's stated management fee rate of 15 basis points applied to the MTBA cash holdings parked in SBIL.

68.     As a direct and proximate result of Simplify's breach, Bassman has been damaged in an amount to be determined at trial, but not less than $1,400,000, exclusive of pre-judgment interest.

## THIRD CAUSE OF ACTION

### Breach of Revenue Share Agreement—RFIX

69.     Bassman repeats and realleges the allegations in paragraphs 1 through 68 as if fully set forth herein.

70.     The revenue-share agreement between Bassman and Simplify for RFIX, formed through written communications in August 2024, is a valid and enforceable contract. Kim, acting within the scope of his actual and ostensible authority as Simplify's CEO, offered Bassman a 20% revenue share on RFIX. At the time of Kim's offer, RFIX had not yet launched. Bassman accepted by continuing to develop RFIX through its launch, by marketing the fund through news outlets and other media, and by treating the agreement as binding. Bassman's continued work on RFIX constituted sufficient consideration for Simplify's promise to pay.

71.     Bassman performed all his obligations under the RFIX agreement.

72.     Simplify has breached the RFIX agreement by refusing to pay Bassman anything for his work on RFIX.

73.     Bassman is entitled to 20% of RFIX's gross revenues, calculated on the basis of RFIX's stated management fee rate.

74.     As a direct and proximate result of Simplify's breach, Bassman has been damaged in an amount to be determined at trial, but not less than $150,000, exclusive of pre-judgment interest.

## FOURTH CAUSE OF ACTION

### Quantum Meruit—MTBA

### (Pleaded in the alternative)

75.     Bassman pleads this cause of action in the alternative to the Second Cause of Action. If the Court determines that no enforceable contract governs Bassman's compensation for his work developing MTBA, Bassman is entitled to recover in quantum meruit for the reasonable value of the services he rendered to Simplify.

76.     Bassman repeats and realleges the allegations in paragraphs 1 through 74 as if fully set forth herein.

77.     Bassman rendered services related to MTBA to Simplify for the company's benefit, including developing, creating, and managing the fund.

78.     Bassman, as evidenced by the correspondence with Kim, had a reasonable expectation of receiving compensation for these services.

79.     Simplify has not paid Bassman for the services and would be unjustly enriched if Bassman were not compensated.

80.     Bassman is therefore entitled to damages in an amount determined at trial.

## FIFTH CAUSE OF ACTION

### Quantum Meruit—RFIX

### (Pleaded in the alternative)

81.     Bassman pleads this cause of action in the alternative to the Third Cause of Action. If the Court determines that no enforceable contract governs Bassman's compensation for his work developing RFIX, Bassman is entitled to

3131939

-17-

COMPLAINT

recover in quantum meruit for the reasonable value of the services he rendered to Simplify.

82.     Bassman repeats and realleges the allegations in paragraphs 1 through 80 as if fully set forth herein.

83.     Bassman rendered services related to RFIX to Simplify for the company's benefit, including developing, creating, and managing the fund.

84.     Bassman, as evidenced by the correspondence with Kim, had a reasonable expectation of receiving compensation for these services.

85.     Simplify has not paid Bassman for the services and would be unjustly enriched if Bassman were not compensated.

86.     Bassman is therefore entitled to damages in an amount determined at trial.

## SIXTH CAUSE OF ACTION

### FAILURE TO PAY EARNED WAGES

### California Labor Code §§ 218.5 218.6

87.     Bassman repeats and realleges the allegations in paragraphs 1 through 56 as if fully set forth herein.

88.     At all relevant times, Bassman was an employee of Simplify within the meaning of the California Labor Code, performed his work for Simplify primarily from California, and received a Form W-2 from Simplify reflecting his compensation.

89.     The revenue-share compensation constitutes "wages" within the meaning of California Labor Code Section 200. It was a non-discretionary, contractually fixed percentage of fund revenue tied directly to Bassman's labor in designing, managing, and promoting the relevant ETFs

90.     Simplify failed and refused to pay Bassman those earned wages when due, including without limitation the full revenue share compensation owed for 2023, 2024, and 2025, in the amounts alleged herein.

91. Pursuant to California Labor Code Section 218.6, Bassman is entitled to interest on all due and unpaid wages from the date those wages were due and payable. Simplify is also subject to, and Bassman is also entitled to recover, and all penalties imposed under the Labor Code for failure to timely pay wages, including without limitation waiting time penalties and late pay penalties.

92. Additionally, Bassman is entitled to reasonable attorney's fees and pursuant to California Labor Code Section 218.5.

## SEVENTH CAUSE OF ACTION

## RETALIATION FOR ASSERTING WAGE RIGHTS

### California Labor Code § 98.6

93. Bassman repeats and realleges the allegations in paragraphs 1 through 92 as if fully set forth herein.

94. At all relevant times, Bassman was an employee of Simplify within the meaning of the California Labor Code, performed his work for Simplify primarily from California, and received a Form W-2 from Simplify reflecting his compensation.

95. The revenue-share compensation constitutes "wages" within the meaning of California Labor Code Section 200. It was a non-discretionary, contractually fixed percentage of fund revenue tied directly to Bassman's labor in designing, managing, and promoting the relevant ETFs.

96. Bassman engaged in protected activity by making complaints that Simplify had failed to pay compensation he had already earned under the PFIX Agreement and the revenue share agreement.

97. Within 90 days of that protected activity, and because of it, Simplify subjected Bassman to adverse employment actions. Among other things, Simplify filed prospectus supplements with the United States Securities and Exchange Commission removing Bassman as the listed Portfolio Manager for PFIX, MTBA, RFIX, and two additional funds. It also banned him from internal trading, risk, and

3131939

-19-
COMPLAINT

sales Slack channels necessary to perform his role, and materially diminished his authority and responsibilities.

98.    Under California Labor Code Section 98.6, that temporal proximity gives rise to a rebuttable presumption that Simplify retaliated against Bassman for asserting his wage rights.

99.    As a direct and proximate result of Simplify's retaliation, Bassman has suffered lost wages and is entitled to reimbursement of lost wages, civil penalties, and all other relief authorized by law.

## EIGHTH CAUSE OF ACTION

## UNFAIR BUSINESS PRACTICES

### California Business and Professions Code § 17200

100.    Bassman repeats and realleges the allegations in paragraphs 1 through 99 as if fully set forth herein.

101.    California Business and Professions Code Section 17200 prohibits unlawful, unfair, or fraudulent business acts or practices.

102.    Simplify engaged in unlawful and unfair business practices by retaliating against Bassman after he asserted his right to be paid earned compensation and by wrongfully withholding that compensation.

103.    Simplify further misrepresented to at least one investor that Bassman's role had not changed and that it was "business as usual." Simplify made these representations after filing prospectus supplements with the United States Securities and Exchange Commission removing Bassman as the listed Portfolio Manager for PFIX, MTBA, RFIX, and two additional funds, and after banning him from internal trading, risk, and sales Slack channels.

104.    Bassman has suffered injury in fact and has lost money as a result of Simplify's unfair competition, including compensation wrongfully withheld from him.

3131939

-20-

COMPLAINT

105.        Pursuant to Business and Professions Code sections 17203 and 17204, Bassman seeks restitution of money wrongfully withheld, injunctive relief, and such other equitable relief as the statute permits.

### REQUEST FOR RELIEF

WHEREFORE, Bassman requests the following relief:

(a)    That the Court enter judgment awarding Bassman damages against Simplify for all economic, monetary, actual, consequential, and compensatory damages Bassman suffered as a result of Simplify's conduct, together with reasonable attorney's fees and costs, and pre- and post-judgment interest at the maximum rate allowable by law; and

(b)    That the Court award such other relief as it deems just and proper.

DATED: April 7, 2026                    */s/ Jonathan Harris*
                                        Jonathan Harris
                                        Robert Cohen
                                        HARRIS ST. LAURENT LLP
                                        40 Wall Street, 53rd Floor
                                        New York, New York 10005
                                        Tel.: (212) 257-1900
                                        jharris@hs-law.com
                                        rcohen@hs-law.com
                                        *Attorneys for Plaintiff Harley Bassman*

DATED: April 7, 2026                    ELLIS GEORGE LLP
                                            Eric M. George
                                            Todd M. Lander


                                        By:        */s/Todd M. Lander*
                                        Todd M. Lander
                                        *Attorneys for Plaintiff Harley Bassman*

/ / /

/ / /

/ / /

3131939                                 -21-
                                    COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.


DATED: April 7, 2026                    */s/ Jonathan Harris*
                                        Jonathan Harris
                                        Robert Cohen
                                        HARRIS ST. LAURENT LLP
                                        40 Wall Street, 53rd Floor
                                        New York, New York 10005
                                        Tel.: (212) 257-1900
                                        jharris@hs-law.com
                                        rcohen@hs-law.com
                                        *Attorneys for Plaintiff Harley Bassman*


DATED: April 7, 2026                    ELLIS GEORGE LLP
                                            Eric M. George
                                            Todd M. Lander



                                        By: ____ */s/Todd M. Lander*
                                        Todd M. Lander
                                        *Attorneys for Plaintiff Harley Bassman*